RENE L. VALLADARES
Federal Public Defender
Nevada State Bar No. 11479
ALLIE WILSON
Assistant Federal Public Defender
New York State Bar No. 5479597
200 S. Virginia Street, Suite 340
Reno, Nevada 89501
(775) 321-8451/Tel.
(702) 388-6261/Fax
Allie_Wilson@fd.org

Attorney for Ryan Horton

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No: 3:24-cr-00041-ART-CLB |
| Plaintiff, | |
| v. | **SENTENCING MEMORANDUM**[1] |
| RYAN HORTON, | |
| Defendant. | |

Ryan Horton, by and through counsel, Assistant Federal Public Defender Allie Wilson, submits this sentencing memorandum in support of a sentence of sixty months' incarceration. For a first-time offender like Mr. Horton, sixty months is a significant sentence that is "sufficient, but not greater than necessary" to serve the sentencing goals of 18 U.S.C. § 3553(a).

---

[1]    This sentencing memorandum is filed one day late with no objection from the government.

**I.        The PSR contains the wrong guideline calculation.**[2]

Probation has inappropriately applied a five-point enhancement for exchanging child pornography for non-pecuniary but valuable consideration under U.S.S.G. 2G2.2(b)(3)(B) and denied Mr. Horton the three-point reduction for acceptance of responsibility despite his timely guilty plea. The resulting guideline range as calculated by Probation is 292-365 months, over thirteen years higher than the correct range of 121-151 months.

**a.    The five-point enhancement for exchanging CSAM for valuable consideration is inapplicable.**

U.S. Probation has recently made it a habit to regularly apply a drastic five-point enhancement for exchanging child pornography for valuable consideration without evidence to support the enhancement. The enhancement, under U.S.S.G. § 2G2.2(b), provides for a five-point increase in the offense level when a defendant "agreed to an exchange with another person under which the defendant knowingly distributed to that other person for the specific purpose of obtaining something of valuable consideration from that other person, such as other child pornographic material, preferential access to child pornographic material, or access to a child." U.S.S.G. § 2G2.2, n. 1. Here, the increase results in a sentencing range that is twelve years higher than it would otherwise be.

It is insufficient that an individual distributed child pornography. The offense of distribution is already contemplated by the increased base offense level of 22, which covers the offenses of both distribution and receipt of child pornography, as opposed to the lower base offense level of 18, which covers mere possession of child pornography.[3]

---

[2]        Because of scheduling complications, Mr. Horton waived the deadline to receive a draft PSR. *See* ECF 64. Mr. Horton was unable to raise these objections with Probation in advance of filing this sentencing memorandum. He has raised the same objections directly to U.S. Probation simultaneously with the filing of this memorandum.

[3]        Neither Probation nor the government has sought the separate, two-point enhancement for distribution without valuable consideration under § 2G2.2(b)(3)(F). If the government seeks that enhancement, it will be separately addressed orally at sentencing.

The language of the enhancement is specific: there must have been a meeting of the minds that the defendant would provide child pornography with the intention of receiving child pornography in exchange. There is no evidence that Mr. Horton agreed with another to provide child pornography "for the specific purpose" of obtaining child pornography. Although Mr. Horton admitted during at his change of plea hearing to both receiving and distributing child pornography, that alone is insufficient for the enhancement. To warrant the enhancement, he must have distributed child pornography for the express purpose of receiving it in exchange.

The burden of proving an enhancement by a preponderance of the evidence falls on the government. *See United States v. Allen*, 434 F.3d 1166, 1173 (9th Cir. 2006). The government cannot prove that this five-point—twelve-year—enhancement applies here because there is no evidence to support it.

### b. Mr. Horton should receive a three-point reduction for acceptance of responsibility.

U.S. Probation further argues that Mr. Horton should not receive the three-point reduction in his offense level for accepting responsibility because he violated the terms of his pretrial release and was re-detained pending resolution of this matter.[4] There is nothing in the Sentencing Guidelines that would suggest that an individual who violates the conditions of pretrial release but who later enters a timely plea of guilty should not receive the three-point reduction for accepting responsibility. Instead, the Guidelines state, "[e]ntry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct

---

[4] As a factual matter, there is insufficient evidence that Mr. Horton is responsible for the single upload of child pornography that triggered the December 14, 2024, CyberTipline report, although there were other violations of his pretrial conditions that were non-criminal in nature and to which he admitted. Mr. Horton's romantic partner was staying in his home at the time and had access to both his computer and his internet service. That same romantic partner stole Mr. Horton's computer when he was told to leave the apartment, an event which was promptly reported to the police. Mr. Horton's pretrial officer confirmed receipt of a police report in connection with that incident.

comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which he is accountable under § 1B1.3 (Relevant Conduct), will constitute significant"—although not incontrovertible—"evidence of acceptance of responsibility." U.S.S.G. § 3E1.1, n. 3.

Probation has not identified any other support for denying the reduction following a timely plea of guilty. Probation has not identified any examples of a denial of the reduction on this basis, nor is counsel aware of any, despite having represented many prior clients who also violated their conditions of release. Probation also has not identified any case law to suggest that this is an appropriate denial of the reduction, nor has counsel identified any case law that would support Probation's position.

Mr. Horton entered a timely plea of guilty and admitted facts to support his conviction in open court. His timely plea allowed the government to avoid the time and expense of trial. He did not obstruct justice. That is exactly what the three-point reduction for acceptance of responsibility intends to reward. To deny him the reduction based on a pretrial violation would mean that there would be no value in pleading guilty to anybody who violates their pretrial conditions. The result would undercut the purpose of the reduction.

With the three-point reduction and without the five-point enhancement, Mr. Horton's recommended sentencing range under the guidelines is 121-151 months.

II. **The sentencing enhancements in the U.S. Sentencing Guidelines for child pornography offenses are critically flawed.**

There is no dispute at this point that the child pornography guidelines are critically flawed. The guidelines were not the product of the sentencing commission's institutional expertise or empirical data. The guidelines further fail to differentiate between offenders by imposing enhancements that apply to nearly all offenders. As a result, courts, academics, and the sentencing commissioners themselves have consistently rejected the child pornography guidelines. *See e.g.*, *United States v. Henderson*, 649 F.3d 955, 963 (9th Cir. 2011).

(upholding a downward variance based on a policy disagreement with the child pornography guidelines).[5]

Mr. Horton's base offense level is 22. To start, that base offense level is four levels higher than it would be if convicted only of possession, rather than receipt and distribution, of child pornography. *See* U.S.S.G. § 2G2.2. At a criminal history category I, that four-point enhancement increased Mr. Horton's sentence before any enhancements by over one year. After that initial four-point enhancement, before any other enhancements, Mr. Horton's guideline sentence range would be 30-37 months in custody.

Yet, due to numerous enhancements that have no demonstrable bearing on culpability or recidivism (and that apply to every, or nearly every child pornography offender), his final guideline sentencing range is 121-151 months in custody. First, Mr. Horton will receive a two-point enhancement for using a computer in furtherance of the offense, an enhancement that applies to nearly every child pornography offender. In the modern era, nobody receives child pornography through the postal service. He will receive a five-point enhancement for the number of images, even though the number of images has been found to have no correlation with recidivism or even with an admitted sexual interest in children.[6] That enhancement increases Mr. Horton's sentence by over two years. Even leaving in place the remaining two enhancements, both of which relate to the age of the children in

---

[5] *See also United States v. Dorvee*, 616 F.3d 174, 184–86 (2d Cir. 2010) (holding § 2G2.2 is 'fundamentally different' from other Guidelines and, unless it is 'applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires); *United States v. Grober*, 624 F.3d 592, 608–09 (3d Cir. 2010) (concluding that § 2G2.2 was not developed pursuant to the Commission's characteristic institutional role and district courts may, but are not obligated to vary on policy basis from it); *United States v. Stone*, 575 F.3d 83, 90 (1st Cir. 2009) (accepting defendant's argument that the child pornography Guidelines are based on congressional directives, and not on the Commission's empirical approach; district courts may therefore disagree with the Guidelines).

[6] A. Eke et al., *A validation study of the Child Pornography Risk Tool (CPORT)*, 31 SEXUAL ABUSE, A JOURNAL OF RESEARCH AND TREATMENT 456-76 (2019).

the images and add two points and four points respectively, Mr. Horton's guideline range would be 57-71 months after accounting for acceptance (with a final offense level of 26 as opposed to 33).

Although Probation views the starting point for Mr. Horton's guideline range as higher than the defense, Probation also acknowledges these flaws by recommending a downward variance based in part on these same flaws in the Sentencing Guidelines. Probation identifies the same two enhancements—for use of a computer and number of images—and suggests that "these enhancements may be over-representative in the defendant's case." PSR ¶ 151.

Many courts, including this one, regularly vary downward to reflect critiques of the guidelines. This Court should again consider the flawed nature of the Sentencing Guidelines as they pertain to child pornography offenses. Mr. Horton's conviction for distribution and receipt in addition to possession of child pornography has no relation to his culpability as a first-time offender. Instead, it reflects a new government policy to pursue mandatory minimum sentences whenever possible. The range the Court should consider to be the starting point for this analysis should be 57-71 months, not 121-151 months.

## III.    Mr. Horton's history and characteristics warrant a downward variance.

Mr. Horton's history and characteristics further warrant a downward variance to the mandatory minimum of 60 months' incarceration. Probation determined that a downward variance of 141 months was appropriate, arriving at a recommendation of ten years despite their incorrect calculation of the guidelines that inflated Mr. Horton's guideline range by more than twelve years. With the appropriate guideline range, Probation's suggested 141-month variance still results in a sentence at the mandatory minimum of five years.

### a. Mr. Horton has struggled his entire adult life with severe depression and anxiety that has resisted his every attempt to treat.

Probation's recommendation of a downward variance was based in part on Mr. Horton's lifelong struggle with depression and anxiety. PSR ¶ 149. Probation correctly noted that the conduct in this case arose in part from Mr. Horton's increasingly desperate attempts "to dissociate in efforts to escape overwhelming emotions." PSR ¶ 29.

Mr. Horton was first diagnosed with major depressive disorder, general anxiety disorder, and attention deficit hyperactivity disorder when he was struggling academically in his first year of college. He worked with campus medical staff over the next years to find medications that would assist him in managing these disorders. For many years, he coped well enough to graduate with a degree in nursing and begin a career in the field. He was a travel nurse, working in the subfields of surgery, oncology, and emergency services.

In 2020, during Covid, Mr. Horton had shifted to emergency medicine, first at Carson Tahoe Regional Medical Center and then at Mammoth Hospital. Mr. Horton now has an additional diagnosis of Post Traumatic Stress Disorder, which he attributes to working as an emergency room nurse during Covid. The diagnosis was made after Mr. Horton was hospitalized due to psychosis and auditory hallucinations in early 2022. While helping a friend, Lynda Bell, care for her elderly mother in Anchorage, AK, Mr. Horton began hearing auditory command hallucinations ordering him to commit suicide. He attempted to overdose on prescribed anxiety medications. He then checked into a local hospital, where his final diagnoses were: "suicidal ideations, unspecified psychosis not due to a substance or known physiological condition, depression…post-traumatic stress disorder." *See* Exhibit A (Records from Providence Alaska Medical Center).[7] He was discharged two days later with a follow up plan to enter inpatient psychiatric care in California.

---

[7] Mr. Horton seeks leave to file Exhibits A-C under seal, as the exhibits contain confidential and HIPAA protected medical information.

A week later, and with the assistance of his family, Mr. Horton entered inpatient psychiatric care for 42 days at AMFM Residential Mental Health Treatment Centers. *See* Exhibit B (AMFM Records). He was diagnosed with major depressive disorder, generalized anxiety disorder, cannabis use disorder, sedative/anxiolytic use disorder, hallucinogen use disorder, substance-induced psychotic disorder, and ADHD, with the possible additional diagnosis of PTSD. *Id.* In addition to his recent hospitalization and episode of psychosis, he described severe depression and anxiety symptoms, regular panic attacks, and persistent thoughts of suicide. *Id.* He expressed his desire to learn better coping skills for his mental health conditions beyond excessive use of mental health medications. *Id.*

For the last five years, Mr. Horton has tried everything to manage his mental health. He saw numerous mental health practitioners for regular counseling. He has tried an assortment of combinations of legally prescribed medications.

Mr. Horton's substance abuse disorder is more difficult to identify than in somebody who regularly uses an illegal drug. He rarely drinks alcohol, and he does not use illegal drugs. He has, however, regularly used legally prescribed medications to excess or in ways that are not in line with medical advice. He used legally prescribed Ketamine to treat his depression. While Ketamine is FDA-approved to treat depression, Mr. Horton used the substance at home as needed and without clinical supervision. His use went against the advice of medical professionals. He also regularly used prescribed sedatives at sufficiently excessive levels that in the year prior to his detention he was twice reported at work for exhibiting symptoms of being under the influence. PSR ¶¶ 92, 94, 125.

Mr. Horton is not using these substances recreationally, but rather in a failed attempt to manage severe depression and anxiety and to overcome suicidal thoughts. The jail has likewise failed to medicate Mr. Horton correctly. *See* Exhibit C (Medical Records from Washoe County Detention Center). He has twice required follow-up evaluations after

8

exhibiting behavior in line with the over-use of sedatives. It took an entire year of detention for medical staff to find a balance of medications that keep Mr. Horton alert while also managing his symptoms.

It is clear that while Mr. Horton requires medications to manage his mental health disorders, he also has historically sought out the dissociative effects of his prescribed medications to escape his negative thoughts. It is also clear that Mr. Horton engaged in the instant offense at least in part for the same purpose, to escape persistent intrusive thoughts that include a desire to self-harm. It is Mr. Horton's hope that following his incarceration, he can seek additional therapeutic care to assist him in continuing to develop healthier coping mechanisms to reduce his dependency on prescribed substances and other means of dissociating from his daily life.

**b. At the time of his arrest, Mr. Horton had a limited support system.**

Mr. Horton's family was supportive, to a point. They are no longer. The family is not unfamiliar with the effects of mental illness. Growing up, he witnessed his mother and his sister struggle with mental illness, and he watched his parents drink excessively. PSR ¶ 87 (noting an ACEs score of four out of ten). When he sought residential mental health treatment in 2022, his parents and his sister assisted him in finding an appropriate program and paying necessary fees. After that, however, when it became apparent that his mental health needs could not be resolved in a single month, they quickly lost patience. When Mr. Horton moved back to Reno in 2022, he had limited contact with them.

Since his arrest in this matter, only his father will speak to him, and only occasionally. His mother and his sister will not. Attempts to engage Mr. Horton's family in the sentencing process were unsuccessful. Conversations with Mr. Horton's sister indicate that the family blames Mr. Horton for his mother's worsening mental health. It is clear that despite other family members also struggling with mental illness, the family lacks insight into Mr. Horton's

9

condition. His sister's resentment was so strong that she obtained a key to Mr. Horton's apartment upon his re-detention in March 2025 on the promise that she would move his belongings into storage and instead threw all his belongings away. Everything he owned prior to his arrest is gone.

Mr. Horton has a habit of self-isolating during periods of severe depression and anxiety. He has followed that pattern in the last few years. He sought the company of a romantic partner, but the person he chose turned out to be physically and emotionally abusive. PSR ¶ 78. He shared with Probation that "he did not have a support system or positive friendships in Reno, which may have contributed to his increase in mental health difficulties and his feelings of isolation." PSR ¶ 82.

As a result, his only positive relationship that he has maintained recently is with a friend, Lynda Bell. She is his only regular contact outside of the detention center. She has been a mentor and consistent source of support for Mr. Horton since they met, 18 years ago, as he has been for her. *See* Exhibit D (Letter from Lynda Bell). They bonded over their shared careers—Ms. Bell is a retired physician's assistant—and their love of skiing and the outdoors. *Id.* She has witnessed him struggle with his mental health, but applauds his work ethic as a dedicated nurse despite those difficulties.

Forming stronger friendships is a core coping mechanism that Mr. Horton wants to develop going forward. He shared with Probation his intention to return to the Bay Area, where he has a larger group of friends with shared interests PSR ¶ 82. Having a better support system despite the absence of his family will surely help Mr. Horton avoid the unhealthy coping mechanisms that he previously relied upon.

10

### c.   This conviction will end Mr. Horton's ten-year career in nursing.

No matter his sentence, there will be a further, significant consequence to Mr. Horton: the loss of his nursing license after securing his undergraduate degree in nursing, nearly completing his graduate degree, and spending a decade in the field.

Mr. Horton was inspired to pursue a degree in nursing after watching two of his grandparents decline and pass away following their diagnoses for Alzheimer's. At the time of his arrest in this matter, he had nearly completed a master's degree in nursing, with a focus on gerontology. He intended to transition into gerontological nursing at low-income hospitals. PSR ¶ 107. He already had over ten years of experience in the field of nursing, working in operating rooms, in emergency rooms, with cancer patients, and with mental health patients.

Mr. Horton's career gave him a strong sense of purpose, and that career is no longer available to him. His nursing license has been permanently suspended as a result of this conviction. PSR ¶ 110. Instead, he is $50,000 in debt for degrees that he can no longer use. PSR ¶ 127. Mr. Horton is now tasked with finding a different career that is equally meaningful to him but that does not require a nursing license.

This Court should factor in this loss as one of the consequences of this conviction in determining an appropriate sentence.

### IV.   The government has not met its burden of proving the amount of restitution.

Mr. Horton additionally objects to the single restitution request to the extent that it exceeds the statutory minimum of $3,000 per victim. The Supreme Court held in *Paroline v. United States*, 572 U.S. 434, 448, 134 S. Ct. 1710, 1722 (2014) that restitution is proper "only to the extent the defendant's offense proximately caused a victim's losses." Assuming the government meets this burden, the government must then establish under that the amount of restitution requested "reflects the defendant's relative role in the causal process that underlies the victim's losses, but which is no less than $3,000." 18 U.S.C. § 2259(b)(2)(B). Therefore,

the government bears the burden of proving that the defendant's individual conduct caused any amount beyond the $3,000 statutory minimum.

There is only one restitution request in this matter, for $5,000. There is no explanation for that calculation. Although the law rightfully imposes mandatory restitution, the documents submitted do not justify an amount over the $3,000 statutory minimum. The defense, therefore, objects to the additional amount over the $3,000 statutory minimum.

## V.    The Court should not impose Special Conditions 3 or 5.

Probation's recommended Special Conditions 3 and 5 are greater than necessary to serve the purposes of sentencing. One—the polygraph condition (proposed Special Condition 5)—is also unconstitutional. These conditions should therefore not be imposed.

Conditions of supervised release are constrained by both the Constitution and by statute. *United States v. Weber*, 451 F.3d 552, 557 (9th Cir. 2006); *United States v. Wise*, 391 F.3d 1027, 1031 (9th Cir. 2004); *United States v. T.M.*, 330 F.3d 1235, 1240 (9th Cir. 2003). As relevant to the statutory limits, a supervised release condition should not be imposed when it does not comply with 18 U.S.C. § 3583(d). To warrant imposition, a condition must:

(1)    be reasonably related to the goals of deterrence, protection of the public, and/or defendant rehabilitation;

(2)    involve no greater deprivation of liberty than is reasonably necessary to achieve those goals; and

(3)    be consistent with any pertinent policy statements issued by the Sentencing Commission under 28 U.S.C. § 994(a).

*United States v. Napulou*, 593 F.3d 1041, 1044–45 (9th Cir. 2010). And in that framework, a condition implicating "a particular significant liberty interest" demands "enhanced" scrutiny; such a condition can be imposed only if "record evidence" supports it for the particular defendant before the court. *United States v. Wolf Child*, 699 F.3d 1082, 1092 (9th Cir. 2012).

The two proposed conditions challenged here do not satisfy these requirements and should therefore not be imposed.

12

**a. The Court should not impose a blanket ban on all pornography (No. 3).**

First, the Court should not impose the blanket "no pornography" special condition proposed by Probation. The proposed condition would ban Mr. Horton from accessing adult pornography—a constitutionally protected interest. And there is no sign that access to adult pornography contributed to the offense here.

To begin, this proposed condition implicates a significant liberty interest. *Wolf Child*, 699 F.3d at 1092. "Adult pornography, unlike child pornography, enjoys First Amendment protection, and so [courts] must be especially cautious when considering a ban on possessing adult pornography." *United States v. Shannon*, 743 F.3d 496, 500 (7th Cir. 2014); *see also United States v. Gnirke*, 775 F.3d 1155, 1163 (9th Cir. 2015) (recognizing that a similar prohibition "unquestionably implicates" the First Amendment).

Courts therefore impose conditions touching on adult pornography only in limited circumstances. They ordinarily only do so where the evidence shows that access to adult pornography "could cause the defendant to revert to accessing child pornography." *United States v. Van Donk*, 961 F.3d 314, 322 (4th Cir. 2020) (citing *United States v. Brigham*, 569 F.3d 220, 232–34 (5th Cir. 2009)). Limitations may also be permissible where there is a documented "connection between pornography and [the defendant's] criminal behavior." *Id.* at 322–23 (citing *United States v. Simmons*, 343 F.3d 72, 81–83 (2d Cir. 2003)). And bans may be allowable if they are helpful in addressing "the defendant's deviant sexual behavior." *Id.* at 323 (citing *United States v. Bee*, 162 F.3d 1232, 1234–35 (9th Cir. 1998)).

"In contrast, appellate courts have struck down such conditions when they were unaccompanied by individualized explanations for their broad sweep." *Van Donk*, 961 F.3d at 323. The government (and Probation) cannot supply a generic explanation or simply assert that an adult pornography ban is "a standard condition for sex offenders." *Id.* at 323 (cleaned up) (collecting cases). Rather, the government must provide "individualized evidence linking pornography" to the defendant's "criminal conduct or rehabilitation and recidivation risk."

*United States v. Ellis*, 984 F.3d 1092, 1099 (4th Cir. 2021). These limitations thus require "detailed factual findings" establishing their necessity given the relevant sentencing factors. *United States v. Eaglin*, 913 F.3d 88, 99 (2d Cir. 2019).

Against this backdrop, a blanket "no pornography" condition is unnecessary here. Nothing in the PSR suggests that adult pornography "may . . . influence" Mr. Horton's behavior in any individualized way. *Ellis*, 984 F.3d at 1099; *see also United States v. Taylor*, 796 F.3d 788, 793 (7th Cir. 2015) (striking down a similar condition because there was no evidence "that viewing or listening to adult pornography would make the repeat of [the defendant's] crime or similar crimes any more likely"). And the absence of any "indication in the record that [Mr. Horton] has an unhealthy relationship with such materials or that such materials contributed to his underlying crimes or other violations" further confirms this condition is unnecessary. *United States v. Salazar*, 743 F.3d 445, 452 (5th Cir. 2014); *see also United States v. Voelker*, 489 F.3d 139, 151 (3d Cir. 2007) (similar).

### a. The Court should not impose a polygraph testing special condition (No. 5)

The Court should also not impose the proposed polygraph testing special condition. The proposed condition is more intrusive than necessary for Mr. Horton. And polygraph testing in this setting is likely to be unconstitutional: it would force Mr. Horton to waive Fifth Amendment rights about his sexual history. The condition should therefore not be imposed.

First, polygraph testing is more intrusive than necessary here. The upsides of polygraph testing are minimal. *See Toussaint v. McCarthy*, 926 F.2d 800, 802 (9th Cir. 1990). "Polygraph test results are often inadmissible in court, and some scientists question polygraph testing's utility." *United States v. Begay*, 631 F.3d 1168, 1175 (10th Cir. 2011) (footnote omitted) (citing *United States v. Scheffer*, 523 U.S. 303, 309–10 (1998)). Courts are generally skeptical of such testing in various contexts. *Id.*

And, as with the "no pornography" condition, other conditions are better suited to accomplishing the purported goals of the proposed polygraphing. Mr. Horton will be required

14

to participate in sex offender treatment, and his use of electronics will be monitored. If he is not participating in treatment as required, he may be reprimanded or revoked on that ground. The added condition of polygraph testing is unnecessary.

Alternatively, the Court should not impose the polygraph condition because it is unconstitutional. The condition would require Mr. Horton to submit to potentially self-incriminating questioning. But it would not adequately permit Mr. Horton to invoke his Fifth Amendment rights in response. The condition thus promises to be unconstitutional.

*United States v. Bahr* is instructive. 730 F.3d 963 (9th Cir. 2013). In *Bahr*, the defendant was required to take a full disclosure polygraph test regarding his sexual history as a part of his sex offender treatment program—something that would likely be required of Mr. Horton under this proposed condition here. *Id.* at 965. The Ninth Circuit invalidated that requirement. *Id.* In so doing, the *Bahr* court explained that "[w]hen the government conditions continued supervised release on compliance with a treatment program requiring full disclosure of past sexual misconduct, with no provision of immunity for disclosed conduct, it unconstitutionally compels self-incrimination." *Id.* at 966. Even the "[r]evocation of supervised release is not necessary to violate the right; the threat of revocation is itself sufficient to violate the privilege and make the resultant statements inadmissible." *Id.*

As a result, the implementation of this condition will violate Mr. Horton's constitutional rights. It should therefore not be imposed.

**VI.    Conclusion**

Mr. Horton comes before this Court with no prior criminal history. He had not spent a single day in jail prior to these charges. He had never been arrested. Now, he faces a significant prison sentence and the loss of a meaningful career that he spent ten years developing. The Sentencing Guidelines would recommend a sentence of over ten years, but that recommendation is far above what is appropriate here given Mr. Horton's history and characteristics and the disconnect between the Sentencing Guidelines and actual culpability. A

sentence of sixty months' imprisonment would be "sufficient, but not greater than necessary" to serve the sentencing goals of 18 U.S.C. § 3553(a).

DATED May 7, 2026

RENE L. VALLADARES
Federal Public Defender

By:  /s/ Allie Wilson
ALLIE WILSON
Assistant Federal Public Defender

16